## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALFRED A. UMBERGER TRUST, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO.** |
| Plaintiff, | ) ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** ) |
| NASH FINCH COMPANY, RON MARSHALL, and LE ANNE M. STEWART, | ) ) |
| Defendants. | ) **JURY TRIAL DEMANDED** ) ) |

Plaintiff, Alfred A. Umberger Trust, ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding by Nash Finch Company ("Nash Finch" or the "Company") securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of persons who purchased the securities of Nash Finch between February 24, 2005, and October 20, 2005, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

### JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.      Plaintiff, Alfred Umberger Trust, as set forth in the accompanying certification, incorporated by reference herein, purchased Nash Finch securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Nash Finch is a Delaware corporation with its principal executive offices located at 7600 France Avenue South, P.O. Box 355 Minneapolis, Minnesota 55435.

8.      Defendant Ron Marshall ("Marshall") was, at all relevant times, the Company's Chief Executive Officer.

9.     Defendant Le Anne M. Stewart ("Stewart") was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer.

10.     Defendants Marshall and Stewart are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Nash Finch's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

11.     Nash Finch engages in the distribution of food, as well as in the ownership and operation of retail stores primarily in the United States. The Company operates in three segments: Food Distribution, Military Food Distribution, and Food Retailing. The Food Distribution segment sells and distributes various nationally branded and private label grocery products from 15 distribution centers to approximately 1,500 grocery stores and other customers. It sells and

distributes principally meat and produce.  The Military Food Distribution segment distributes

grocery products to the U.S. military commissaries.  The Food Retailing segment operates

corporate-owned stores, including conventional stores and supermarkets.  The Company operated

85 corporate-owned stores primarily located in Colorado, Illinois, Iowa, Minnesota, Nebraska, North

Dakota, South Dakota, Wisconsin, and Wyoming, as of January 1, 2005.  It serves independent

retailers and military commissaries in 26 states, the District of Columbia, Europe, Cuba, Puerto

Rico, Iceland, the Azores, and Honduras. Nash Finch was established in 1885 and is headquartered

in Minneapolis, Minnesota.

### Materially False And Misleading
### Statements Issued During The Class Period

12.    The Class Period commences on February 24, 2005.  At that time,  Nash Finch

announced the $220 million acquisition of Roundy's Distribution Center, a mid-west food

distributor, which was to add almost $1 billion in yearly sales to the Company, be immediately

accretive to earnings, and create synergies of almost $10 million per year in cost savings and

elimination of redundancies.  More specifically, the Company stated:

> Nash Finch Company (Nasdaq:NAFC) announced today that it has
> signed an agreement with Roundy's, Inc. to acquire the net assets,
> including customer contracts, of its wholesale food distribution
> divisions in Westville, Indiana, and Lima, Ohio, and two retail stores
> in Ironton and Van Wert, Ohio, for approximately $225 million.
>
> The Westville and Lima Divisions to be acquired represent
> approximately $1.0 billion in annual food distribution sales, servicing
> over five hundred customers, principally in Indiana, Illinois, Ohio
> and Michigan. The distribution centers to be acquired fit well with
> the Company's existing network and no facility closures are
> anticipated. The strategically located distribution centers will allow
> the Company to expand merchandising programs in a variety of
> areas, including the distribution of produce and meat, general

merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying efficiencies, which will be realized over several years. Specific examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. The Company expects that the acquisition will be immediately accretive to earnings. Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition operating earnings will improve by approximately $31 to $33 million, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

Ron Marshall, Chief Executive Officer of Nash Finch, commented on the acquisition, "We have long admired the outstanding customers and dedicated associates of these divisions and are excited for them to join our organization. Those customers have our commitment that they will experience the same levels of outstanding customer service that all Nash Finch customers enjoy today. Customers of both Nash Finch and these Divisions will benefit from our ability to buy product much more efficiently as a combined organization, improving their ability to win in an increasingly competitive market. Most importantly, however, this acquisition continues to underscore our strategic commitment to the independent grocery retailing community."

13.     On March 2, 2005, Nash Finch issued a press release entitled "Nash Finch Reports Fiscal 2004 Results; Refinancing Strengthens Balance Sheet; Announced Acquisition Represents $1 billion in Annual Food Distribution Sales." Therein, the Company, in relevant part, stated:

Nash Finch Company (NASDAQ:NAFC), a leading national food distributor, today announced that net earnings for the 52 week fiscal 2004 year were $14.9 million, or $1.18 per diluted share, as compared to $35.1 million, or $2.88 per diluted share, for the 53 week 2003 year. Earnings from continuing operations were $14.9 million, or $1.18 per diluted share, for fiscal 2004 as compared to $34.7 million, or $2.85 per diluted share, for fiscal 2003. Fiscal 2004 earnings from continuing operations included several events, listed

on the schedule attached to this release, which had a net unfavorable impact of $24.0 million, or $1.89 per diluted share, the largest of which was a special charge of $21.0 million, or $1.66 per diluted share, involving primarily non-cash costs associated with the disposition of 21 retail stores. Fiscal 2003 earnings from continuing operations included several events, also listed on the attached schedule, which had a net favorable impact of $4.5 million, or $0.37 per diluted share. Total sales for fiscal 2004 were $3.9 billion versus $4.0 billion in fiscal 2003. Excluding $68.4 million of extra sales from the 53rd week, fiscal 2003 sales would have been $3.9 billion.

***

Food Distribution Acquisition

The Company announced on February 24, 2005 that it had signed an agreement with Roundy's, Inc. to acquire the net assets, including customer contracts, of its wholesale food distribution divisions in Westville, Indiana and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million.

The Westville and Lima Divisions to be acquired represent approximately $1.0 billion in annual food distribution sales, servicing over five hundred customers, principally in Indiana, Illinois, Ohio and Michigan. The distribution centers to be acquired fit well with the Company's existing network and no facility closures are anticipated. The strategically located distribution centers will allow the Company to expand merchandising programs in a variety of areas including the distribution of produce and meat, general merchandise, and health and beauty care. The Company expects that the acquisition will result in productivity improvements and buying efficiencies, which will be realized over several years. Examples of productivity improvements include the better balancing of transportation across the Company's distribution network to reduce miles and equipment, enhanced warehouse capacity utilization, and the reduction of outside storage space. The Company expects that the acquisition will be immediately accretive to earnings. Specifically, depending on the timing and nature of its integration process, the Company believes that as a result of the acquisition operating earnings, defined as sales less cost of sales and selling, general and administrative expenses, will improve by approximately $31 to $33 million, net of implementation costs of approximately $3 million, during the twelve months following closing of the transaction. This estimate includes a portion of the more than $8 million in annual synergies expected to

be realized over several years. The impact on earnings per share will depend upon the nature and cost of the related financing, as well as the purchase accounting allocations and related amortization.

***

Outlook

The Company estimates that its diluted earnings per share for fiscal 2005 will range between $3.40 and $3.55 before the accretive effect of the acquisition discussed above. This compares to fiscal 2004 earnings from continuing operations of $1.18 per diluted share which included several events that had a net unfavorable impact of $24.0 million, or $1.89 per diluted share. This outlook for fiscal 2005 assumes low single digit sales growth in our food and military food distribution segments and flat to slightly negative same store sales in our retail segment. In addition, the Company anticipates some margin improvement across all segments as we continue to focus on productivity efficiencies. Depreciation and amortization will be impacted by capital expenditures during fiscal 2005 of approximately $35 million. We also estimate our average interest rate to be approximately 7.0% in fiscal 2005. Finally, the Company expects its working capital to remain relatively consistent with 2004.

14.     Also on March 2, 2005, Nash Finch filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by Individual Defendants and reaffirmed the Company's previously announced financial results.   Additionally, the Company's Form 10-K contained the following statements describing Nash Finch's accounting policies:

Critical Accounting Policies

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities. Management bases its estimates on historical experience and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that may not be readily apparent from other sources. Senior management has discussed the development, selection and disclosure

of these estimates with the Audit Committee of our Board of Directors and with our independent auditors.

An accounting policy is considered critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact our financial statements. We consider the following accounting policies to be critical and could result in materially different amounts being reported under different conditions or using different assumptions:

15.     Additionally, the Company's Form 10-K contained the following discussion of

the Company's internal controls:

Disclosure Controls and Procedures

Management of the Company, with the participation and under the supervision of the Chief Executive Officer and Chief Financial Officer has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this annual report. Based on this evaluation the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this annual report to provide reasonable assurance that material information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.

***

Management Report On Internal Control Over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's board of directors, management and other personnel,

to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

\*\*\*

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of January 1, 2005. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on our assessment, management believes that, as of January 1, 2005, the Company's internal control over financial reporting is effective based on those criteria.

16.     Lastly, the Company's Form 10-K contained the following Sarbanes Oxley certifications signed by defendants Marshall and Stewart:

[CERTIFICATION PURSUANT TO RULES 13a-14(a)/15d-14(a)
UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS
AMENDED]

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended January 1, 2005 of Nash Finch Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

## SECTION 1350 CERTIFICATION OF THE CHIEF EXECUTIVE
## OFFICER AND CHIEF FINANCIAL OFFICER

In connection with the Annual Report on Form 10-K of Nash Finch Company, (the "Company") for the period ended January 1, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Ron Marshall, Chief Executive Officer and LeAnne M. Stewart, Senior Vice President and Chief Financial Officer, respectively, of the Company, certify, pursuant to 18. U.S.C. Section 1350, that to our knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

17.     On March 31, 2005, Nash Finch issued a press release entitled "Acquired Roundy's Distribution Centers Represent Approximately $1.0 Billion in Annual Food Distribution Sales." Therein, the Company, in relevant part, stated:

Nash Finch Company (NASDAQ:NAFC), announced today that it has completed the purchase from Roundy's Inc. of the net assets, including customer contracts, of the wholesale food distribution divisions in Westville, Indiana, and Lima, Ohio, and two retail stores in Ironton and Van Wert, Ohio, for approximately $225 million. The Company had announced its agreement to purchase these assets on February 24, 2005.

The Westville and Lima Divisions represent approximately $1.0 billion in annual food distribution sales, servicing over five hundred customers principally in Indiana, Illinois, Ohio and Michigan. No facility closures are expected given the strategic fit of these distribution centers into the Nash Finch network.

"We are very pleased that this purchase is complete and we look forward to a smooth transition," stated Ron Marshall, Chief Executive Officer. "Over the past few weeks, I have visited many of our new independent operators and I am impressed with their innovative stores and their uniform passion for supermarket retailing. Our continuing commitment to all our independent customers is to help them grow their businesses in an increasingly competitive market. Everyone at Nash Finch - including the approximately 800 new associates we welcomed to the Company today - is excited about the opportunities we now have to expand our merchandising programs and improve productivity throughout our distribution network."

18.    On April 21, 2005, Nash Finch issued a press release entitled "Nash Finch Reports First Quarter 2005 Results; Net Income Increases 49%; Revenue Growth Continues in Food Distribution and Military."  Therein, the Company, in relevant part, stated:

Nash Finch Company (Nasdaq:NAFC), a leading national food distributor, today announced that earnings for the first quarter of 2005 were $7.0 million, or $0.54 per diluted share, as compared to $4.7 million, or $0.38 per diluted share for the first quarter last year, an increase of 49 percent. Total sales for the quarter rose to $882.2 million versus $879.5 million in the prior-year quarter. Sales growth in the food distribution and military segments more than offset the revenue impact of closing the Company's underperforming retail stores at the end of the second quarter 2004. "We are pleased with the results of our quarter which are in line with our expectations and represent increases in profitability across all segments of our

business," said Ron Marshall, Chief Executive Officer. "Moreover we completed the acquisition of the distribution centers in Lima and Westville shortly after the close of the first quarter and integration efforts are proceeding according to plan."

***

Outlook

The Company is reaffirming its earnings guidance range of between $3.40 and $3.55 in diluted earnings per share for fiscal 2005 before the accretive effect of the acquisition discussed above. This range compares to fiscal 2004 earnings from continuing operations of $14.9 million, or $1.18 per diluted share. Fiscal 2004 results included several events, listed on the schedule attached to this release, which had a net unfavorable impact of $24.0 million, or $1.89 per diluted share, the largest of which was a special charge of $21.0 million, or $1.66 per diluted share, involving primarily non-cash costs associated with the disposition of 21 retail stores.

19.    On May 3, 2005, Nash Finch filed its quarterly report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by Individual Defendants and reaffirmed the Company's

previously announced financial results.   Additionally, the Company's Form 10-Q included the

following discussion of Nash Finch's accounting policies:

Note 1 – Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. For further information, refer to the consolidated financial statements and footnotes included in the Company's Annual Report on Form 10-K for the year ended January 1, 2005.

The accompanying financial statements include all adjustments which are, in the opinion of management, necessary to present fairly the financial position of the Company and its subsidiaries at March 26, 2005, January 1, 2005 and March 27, 2004, and the results of operations and changes in cash flows for the twelve weeks ended

March 26, 2005, and March 27, 2004.  All material intercompany accounts and transactions have been eliminated in the unaudited consolidated financial statements.  Results of operations for the interim periods presented are not necessarily indicative of the results to be expected for the full year.

*** 

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses, and related disclosure of contingent assets and liabilities.  Management bases its estimates on historical experience, consultation with experts and various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that may not be readily apparent from other sources.

*** 

## ITEM 4.  CONTROLS AND PROCEDURES

Management of the Company, with the participation and under the supervision of the Chief Executive Officer and Chief Financial Officer has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e)) as of the end of the period covered by this quarterly report.  Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective as of the end of the period covered by this quarterly report to provide reasonable assurance that material information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.  There was no change in the Company's internal control over financial reporting that occurred during the Company's most recently completed fiscal quarter that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

20.     On July 21, 2005, Nash Finch issued a press release entitled "Nash Finch Reports Second Quarter 2005 Results; Integration of Acquisition Proceeding as Planned."  Therein, the Company, in relevant part, stated:

> Nash Finch Company (Nasdaq: NAFC), a leading national food distributor, today announced that net earnings for the second quarter ended June 18, 2005 were $9.7 million, or $0.75 per diluted share, as compared to a net loss of $15.6 million, or $1.26 per diluted share, for the second quarter of 2004. Total sales for the second quarter of 2005 were $1.085 billion as compared to $906.4 million in the prior-year period, reflecting the Company's acquisition from Roundy's Supermarkets, Inc. of wholesale food distribution divisions located in Lima, Ohio and Westville, Indiana effective March 31, 2005.
>
> For the first 24 weeks of 2005, the Company's net earnings were $16.7 million, or $1.28 per diluted share, as compared to a net loss of $10.9 million, or $0.88 per diluted share, for the same period last year. Total sales for the first 24 weeks of 2005 were $1.967 billion compared to $1.786 billion in the prior-year period.
>
> Second quarter and year-to-date 2004 results were adversely affected by an after-tax special charge of $22.3 million, or $1.80 per diluted share, associated primarily with the closure of 18 retail stores at the end of that quarter, and by $2.0 million, or $0.16 per diluted share, in after-tax costs (primarily inventory markdowns) related to those closures that were recorded in operating income. Second quarter and year-to-date 2005 results included the reversal of $0.8 million of that special charge, or $0.06 per diluted share, reflecting the Company's decision to continue operating its three Denver-area AVANZA(R) stores, and an after-tax bridge loan commitment fee of $0.5 million, or $0.03 per diluted share, related to potential financing for the acquisition of the Lima and Westville divisions.
>
> The Company's operating cash flow was strong during the second quarter, enabling the Company to repay $36 million of acquisition-related indebtedness by the end of the second quarter. The Company will continue to focus on effectively managing its working capital, reducing indebtedness and improving its Consolidated EBITDA(1). Consolidated EBITDA for the second quarter 2005 was $33.7 million, compared to $28.6 million in the same quarter last

year, and $57.4 million for the first twenty-four weeks of 2005, compared to $52.9 million in the same period last year.

Food Distribution Results

Food distribution segment sales for the second quarter of 2005 increased 44.2% to $647.7 million compared to $449.2 million in the second quarter 2004, and for the first 24 weeks of 2005 increased to $1.098 billion from $880.3 million. The acquisition of the distribution centers added $185 million in food distribution sales during the second quarter. Excluding the impact of the acquisition, food distribution sales increased 3.0% in the second quarter and 3.7% year-to-date over the prior year. Second quarter 2005 food distribution segment profits increased 20.3% to $21.3 million versus $17.7 million in the year earlier quarter, but decreased as a percentage of sales from 3.9% to 3.3%. In the 24 week comparison, segment profits in the 2005 period were $36.9 million compared to $32.2 million in the 2004 period.

"Integration of the Lima and Westville operations is proceeding according to plan," said Ron Marshall, Chief Executive Officer. "While we expected integration costs to affect food distribution margins in the short term, as occurred during the second quarter, we did not fully appreciate the degree to which the demands of integrating a significant acquisition would divert attention from daily operations and affect our day to day execution. Given the front-end loading of the integration costs and the steps we have taken to improve execution, we expect operating margins in this segment to rebound as we begin to realize the synergies inherent in this acquisition."

                                          ***

Outlook

The Company expects that the acquisition of the distribution centers will add approximately $0.30 to $0.34 to its previously disclosed pre-acquisition estimate that 2005 diluted earnings per share would range between $3.40 and $3.55. As a result, the Company now estimates that its diluted earnings per share for fiscal 2005 will range between $3.70 and $3.89. Further, the Company expects that for fiscal 2005 its interest expense will be approximately $25 million and its combined expense for depreciation and amortization will be approximately $45 million.

21.     Also on July 21, 2005, Nash Finch filed its quarterly report with the SEC on Form

10-Q.   The Company's Form 10-Q was signed by Individual Defendants and reaffirmed the

Company's previously announced financial results.   Additionally, the Company's Form 10-Q

included the following discussion of Nash Finch's accounting policies:

> Note 1 – Basis of Presentation
>
> The accompanying unaudited consolidated financial statements of
> Nash Finch Company ("Nash Finch" or the "Company") have been
> prepared in accordance with generally accepted accounting principles
> for interim financial information.  Accordingly, they do not include
> all of the information and footnotes required by generally accepted
> accounting principles for complete financial statements.  For further
> information, refer to the consolidated financial statements and
> footnotes included in the Company's Annual Report on Form 10-K
> for the year ended January 1, 2005.
>
> The accompanying financial statements include all adjustments which
> are, in the opinion of management, necessary to present fairly the
> financial position of the Company and its subsidiaries at June 18,
> 2005, January 1, 2005 and June 19, 2004, and the results of
> operations for the twelve and twenty-four weeks ended June 18, 2005
> and June 19, 2004 and changes in cash flows for the twenty-four
> weeks ended June 18, 2005 and June 19, 2004. All material
> intercompany accounts and transactions have been eliminated in the
> unaudited consolidated financial statements. Results of operations for
> the interim periods presented are not necessarily indicative of the
> results to be expected for the full year.
>
> ***
>
> ITEM 4.  CONTROLS AND PROCEDURES
>
> Management of the Company, with the participation and under the
> supervision of the Chief Executive Officer and Chief Financial
> Officer has evaluated the effectiveness of the Company's disclosure
> controls and procedures (as defined in Exchange Act Rule 13a-15(e))
> as of the end of the period covered by this quarterly report.  Based on
> this evaluation, the Chief Executive Officer and Chief Financial
> Officer have concluded that the Company's disclosure controls and
> procedures are effective as of the end of the period covered by this

quarterly report to provide reasonable assurance that material information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.  There was no change in the Company's internal control over financial reporting that occurred during the Company's most recently completed fiscal quarter that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

22.     On September 1, 2005, Nash Finch issued a press release entitled "Nash Finch Announces Ron Marshall to Resign in 2006."  Therein, the Company, in relevant part, stated:

Nash Finch Company (Nasdaq:NAFC), a leading national food distributor, today announced that Chief Executive Officer Ron Marshall has advised the Company that he will resign as of March 2, 2006. Mr. Marshall will continue as CEO and as a Director of the Company until that date and will assist in the search for his successor. Allister Graham, Chairman of the Nash Finch Board of Directors, will chair a special committee of the Board to conduct that search.

Marshall, 51, has served as Nash Finch CEO since June 1998. "I am very proud of the performance driven culture that the executives and associates have developed at our Company, allowing us to succeed by focusing on the needs of our independent retailer customers, who include some of the best marketers in the country," said Marshall. "It has been a privilege to work with them, and I will miss our association. Our Company has tremendous opportunities ahead of it, but after more than seven years in this position, I believe it is time to turn over the leadership of this enterprise, and consider new challenges. I look forward to assisting Al and his committee in their search."

"Ron took control of this Company at a critical point in its history, when it had lost direction and was in decline," said Chairman of the Board Al Graham. "In its place, he gave us great leadership, created a culture of continuous improvement, and a sense of commitment and direction. He developed a most effective team and a comprehensive strategic plan that has positioned this Company very well. It has been a delight working with him and we shall miss him."

23.     On October 5, 2005, Nash Finch issued a press release entitled "Nash Finch Announces Effectiveness of Resale Registration Statement in Connection With Previously Issued Senior Subordinated Convertible Notes."  Therein, the Company, in relevant part, stated:

> Nash Finch Company (Nasdaq:NAFC), a leading national food distributor, announced today that the Securities and Exchange Commission has declared effective its registration statement on Form S-3 relating to the resale of previously issued $322 million in aggregate principal amount at maturity of senior subordinated convertible notes due 2035 and any shares of Nash Finch common stock issuable upon conversion of these notes. The notes were issued in a March 2005 private offering. Nash Finch will not receive any proceeds from the resale of the securities by the selling securityholders.

24.     The statements contained in ¶¶ 12-23 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the merger between Nash Finch and Roundy's Distribution Center was plagued by integration problems; (2) that the Company's net sales growth rate and earnings growth rate could not be sustained due to the integration issues with the Roundy's Distribution Center; (3) that the Company's core business was under-performing; (4) that the Company failed to maintain adequate internal controls; and (5) that as a result of the above, the defendants' fiscal projections were lacking in any reasonable basis when made.

### The Truth Begins To Emerge

25.     On October 20, 2005, Nash Finch issued a press release entitled "Nash Finch Company Provides Fiscal 2005 Earnings Update."  Therein, the Company, in relevant part, stated:

> Nash Finch Company (Nasdaq:NAFC), a leading national food retailer and distributor, today announced that it is revising its earnings outlook for fiscal year 2005 ending December 31, 2005. The Company now expects fully diluted earnings per share for the year in the range of $3.00 to $3.25 per share. The Company reported fully

diluted earnings per share of $1.18 in fiscal 2004. Previously the Company had estimated 2005 fully diluted earnings per share would range between $3.70 and $3.89 per share.

The revised earnings estimate is due to a decline in retail gross profit margins, primarily reflecting inadequate execution in pricing across the Company's retail operations; depressed wholesale gross profit margins principally relating to manufacturer promotional spending; and higher than expected acquisition integration costs.

"Clearly the acquisition of the Westville, Indiana and Lima, Ohio divisions earlier in the year resulted in a lack of focus in our core business," said Ron Marshall, Chief Executive Officer. "We have experienced serious erosion in retail and wholesale gross profit margins, based on issues that we had thought were readily resolvable. Unfortunately, the impact has been deeper than we anticipated and margins will take longer to rebound than we had thought, but these issues are fixable and we are addressing each one of them."

26.     On this news, shares of Nash Finch fell $12.76 per share, or 28.6 percent, on October 21, 2005, to close at $30.04 per share.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Nash Finch between February 24, 2005 and October 20, 2005, common stock offering, and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nash Finch's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nash Finch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nash Finch; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### SCIENTER ALLEGATIONS

33.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Nash Finch, their control over, and/or receipt and/or modification of Nash Finch's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nash Finch, participated in the fraudulent scheme alleged herein.

34.     During the Class Period and with the Company's stock trading at artificially inflated prices, the Company insiders sold 426,427 shares for gross proceeds of $17,052,105.20, as evidenced by the following chart:

|  | Date | # of Shares | Proceeds |
| --- | --- | --- | --- |
| David Bersie | 08/02/2005<br>07/28/2005<br>07/27/2005 | 130 @ $42.890<br>34,750 @ $40.820<br>3,547 @ $41.750<br>*Total Shares:<br>38,427* | $148,087.25<br>$1,418,495.00<br>$5,575.70<br>*Total Proceeds:<br>1,572,157.95* |

| Bruce Cross | 07/26/2005 | 18,000 @ $41.370<br>*Total Shares:*<br>*18,000* | $744,660.00<br>*Total Proceeds:*<br>*$744,660.00* |
|---|---|---|---|
| Allistair Graham | 08/18/2005 | 12,500 @ $40.460<br>*Total Shares:*<br>*12,500* | $505,750.000<br>*Total Proceeds:*<br>*$505,750.00* |
| Ron Marshall | 08/08/2005<br>08/05/2005<br>07/28/2005<br>07/27/2005<br>07/26/2005<br>04/29/2005<br>04/28/2005 | 20,000 @ $41.840<br>30,000 @ $41.940<br>145,500 @ $40.630<br>33,000 @ $ 41.390<br>21,500 @ $41.490<br>68,500 @ $35.000<br>6,500 @ $35.163<br>*Total Shares:*<br>*325,000* | $228,560.15<br>$2,397,500.00<br>$892,035.00<br>$1,365,870.00<br>$5,911,665.00<br>$1,258,200.00<br>$836,800.00<br>*Total Proceeds:*<br>*$12,890,630.15* |
| Kathleen McDermott | 07/29/2005 | 9,000 @ $40.540<br>*Total Shares:*<br>*9,000* | $364,860.00<br>*Total Proceeds:*<br>*$364,860.00* |
| Jeffrey Poore | 08/04/2005 | 18,000 @ $42.413<br>*Total Shares:*<br>*18,000* | $763,428.60<br>*Total Proceeds:*<br>*$763,428.60* |
| Gregory Sandeno | 08/02/2005<br>04/26/2005 | 1,500 @ $42.919<br>4,000 @ $36.560<br>*Total Shares:*<br>*5,500* | $146,240.00<br>$64,378.50<br>*Total Proceeds:*<br>*$210,618.50* |

## **UNDISCLOSED ADVERSE FACTS**

35.     The market for Nash Finch's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Nash Finch's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Nash Finch securities relying upon the integrity of the market price of Nash Finch's securities and market information relating to Nash Finch, and have been damaged thereby.

36.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Nash Finch's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Nash Finch's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Nash Finch and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

38.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

39.     During the Class Period, Plaintiff and the Class purchased securities of Nash Finch at artificially inflated prices and were damaged thereby.  The price of Nash Finch's common stock

declined when the misrepresentations made to the market, and/or the information alleged herein to had been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

40.     At all relevant times, the market for Nash Finch securities was an efficient market for the following reasons, among others:

(a)  Nash Finch stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, Nash Finch filed periodic public reports with the SEC and the NASDAQ;

(c)  Nash Finch regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  Nash Finch was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Nash Finch securities promptly digested current information regarding Nash Finch from all publicly-available sources and reflected such information in Nash Finch's stock price.  Under these circumstances, all purchasers of Nash Finch

securities during the Class Period suffered similar injury through their purchase of Nash Finch securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nash Finch who knew that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Nash Finch securities at artificially inflated prices.  In furtherance

of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

45.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Nash Finch securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Nash Finch as specified herein.

47.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nash Finch value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Nash Finch and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Nash Finch securities during the Class Period.

48.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

49.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Nash Finch's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Nash Finch securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Nash Finch's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Nash Finch securities during the Class Period at artificially high prices and were damaged thereby.

51.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Nash Finch was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Nash Finch securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

52.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Nash Finch within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, Nash Finch and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 3, 2006                    **HEAD, SEIFERT & VANDER WEIDE**


**By:** /s Thomas V. Seifert
    Thomas V. Seifert (#98863)
    Vernon J. Vander Weide (#112173)

333 South Seventh Street, Suite 1140
Minneapolis, Minnesota 55402
Telephone:  612-339-1601


**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Tamara Skvirsky, Esquire
280 King of Prussia Road,
Radnor, PA 19087
Telephone:  610-667-7706

**Attorneys for Plaintiff**